**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

    vs.                                        16-CR-668 JAP

**STEVE COLEMAN**,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

On April 25, 2016, Defendant Steve Coleman filed a motion to suppress challenging both the validity of the January 22, 2016 warrant authorizing the search of his property and the manner of the warrant's execution. *See* MOTION TO DISMISS COUNT II AND MOTION TO SUPPRESS ALL FRUITS OF SEARCH, FOR ALL PURPOSES, INCLUDING BUT NOT LIMITED TO TRIAL TESTIMONY, IMPEACHMENT, REBUTTAL, CALCULATION OF SENTENCING GUIDELINES, AND SENTENCING CONSIDERATION (Doc. No. 20) ("Motion"). On July 19, 2016, the Court entered a MEMORANDUM OPINION AND ORDER (Doc. No. 32) rejecting Defendant's attack on the validity of the warrant and reserving ruling on Defendant's claim that officers grossly exceeded the terms of the warrant when they conducted a lengthy search of his property, involving many officers and the thorough documentation of Defendant's home and belongings. Having considered the parties' initial arguments,[1] the supplemental briefing, *see* DEFENDANT'S SUPPLEMENTAL BRIEF CONCERNING THE MANNER OF EXECUTION OF THE STATE SEARCH WARRANT (Doc. No. 34) and

---

[1] In addition to the Motion, the Court has read and considered UNITED STATES' RESPONSE TO MOTION TO SUPPRESS FRUITS OF SEARCH AND DISMISS COUNTS TWO (Doc. No. 21) ("Response") and DEFENDANT'S REPLY TO THE UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT II, AND MOTION TO SUPPRESS ALL FRUITS OF SEARCH, FOR ALL PURPOSES, INCLUDING BUT NOT LIMITED TO TRIAL TESTIMONY, IMPEACHMENT, REBUTTAL, CALCULATION OF SENTENCING GUIDELINES, AND SENTENCING CONSIDERATION (Doc. No. 25) ("Reply").

UNITED STATES' RESPONSE TO ORDER FOR SUPPLEMENTAL BRIEFING (Doc. No. 38), as well as the relevant law, the Court will deny Defendant's request to suppress all of the evidence seized during the January 22, 2016 search.

## Background

The facts are largely undisputed. On January 21, 2016, New Mexico State Police Officer William Radasa was dispatched to Poor Farm Road in Thoreau, New Mexico to investigate claims that Defendant Steve Coleman, a felon, had shot his neighbor's dogs. *See* SEARCH WARRANT (Doc. No. 21-1 at 3, 5). During the course of the investigation, Defendant admitted to the police that he had used his wife's gun to shoot at his neighbor's dogs in order to protect his two female puppies. *Id.* at 4-5. Given this admission, Officer Radasa arrested Defendant and obtained a warrant to search Defendant's property – a 423.5 acre ranch – for firearms and other evidence of the dog shooting. *Id.* at 5. The warrant authorized the seizure of: (1) fingerprints and footprints, (2) DNA evidence, (3) firearms, (4) ammunition, (5) firearm documentation, (6) dog remains, (7) photographs of the deceased dogs, (8) alcoholic beverages, and (9) electronic and media equipment. *Id.* at 2-3. In addition, the warrant allowed for the "documentation of the herein-described premises, vehicle(s), person(s) and/or the herein-described item(s), to be seized, by means of measurement, photography, videography and/or any other means deemed necessary by law enforcement and/or person(s) assisting law enforcement." *Id.* at 3.

On June 14, 2016, the Court held an evidentiary hearing in order, among other things, to hear testimony regarding the execution of the warrant to search Defendant's property. At this hearing, Sergeant Shawn Martin with the New Mexico State Police testified regarding the search. Based on this testimony, the Court makes the following findings of fact under Federal Rule of Criminal Procedure 12(d):

1. On January 22, 2016, New Mexico State Police officers executed the warrant that
   Officer Radasa obtained to search Defendant's property. TRANSCRIPT OF JUNE
   14, 2016 HEARING (Doc. No. 28 at 43:13-20) ("Transcript").

2. Sergeant Shawn Martin, the duty sergeant for January 22, 2016, acted as the search
   supervisor. *Id.* at 79:15-16; 83:18-22. Sergeant Martin, along with Lieutenant Troy
   Velasquez, decided who was allowed to enter the property during the search. *Id.* at
   84:12-17.

3. The search lasted for roughly 13.5 hours, beginning at 10:30 a.m. and ending around
   midnight. *Id.* at 80:19-20; 99:14-19.[2]

4. During this time, officers searched Defendant's main residence and all of the
   buildings located on his 423.5 acre property, uncovering more than 65 weapons in the
   process. *Id.* at 99:22-25.

5. While it is not entirely clear how many officers participated in the search, the crime
   scene log and police reports submitted to the Court confirm that at least 20 New
   Mexico State Police officers assisted in the execution of the warrant.[3]

6. In addition, the crime scene log shows that three animal control officers, one OMI
   agent, two or possibly three Navajo Nation representatives, three United States Fish
   and Wildlife agents, three Gallup Police Department officers, and a handful of other

---

[2] The crime scene log indicates that Sergeant Martin arrived on the scene at 10:24 a.m. and that New Mexico State Police officers left the scene at 9:15 p.m. *See* Joint Exhibit 4. Similarly, the police report of Lieutenant Troy Velasquez states that "all New Mexico State Police officers were complete with the search of the property and were clear from the residence" at approximately 9:19 p.m. *See* Joint Exhibit 3. These documents would suggest that the search was actually closer to 11 hours. Nevertheless, in order to give Defendant the benefit of the doubt, the Court will accept as true Sergeant Martin's testimony that the search lasted from 10:30 a.m. to midnight.

[3] Defendant argues that 21 New Mexico State Police officers participated in the search, including both Officer Arthur Cruz and Officer Mike Cruz. The Court, however, could not find evidence that Officer Arthur Cruz was present at the scene in addition to Officer Mike Cruz. However, the Court's determination would remain the same even if there were 21 New Mexico State Police officers at the scene.

unidentified officers visited the scene, for a total of approximately 33-36 officers on the scene during the search.[4]

7.  Five members of the McKinley County District Attorney's Office were also present during part of the search, which is atypical. *Id.* at 89:10-14; 91:3-6.

8.  Sergeant Martin explained that he called the "Navajo Nation prosecutor" and invited representatives from the Navajo Nation to the scene because he observed "traditional artifacts" in the house that he believed "should not be in the possession of a non-Native American." *Id.* at 84:18-20; 96:18-97:3. When the Navajo Nation representatives arrived, Sergeant Martin told them what he had seen and allowed them to view and "verify" the objects in the home. *Id.* at 97:10-13. He instructed the Navajo Nation representatives that they could only look at the items and were "not going to help [the New Mexico State Police] get anything." *Id.* at 14-16. He explained that if they saw something incriminating they would have to go through their own process to obtain a warrant. *Id.* at 16-18.

9.  The representatives from the Navajo Nation brought the three United States Fish and Wildlife agents with them. Sergeant Martin also allowed the Fish and Wildlife agents to be on the scene. *Id.* at 85:1-2; 93:15-21.

10. Sergeant Martin also invited three members from the Gallup Police Department to view the scene. *Id.* at 91:12-92:5. This came about because the Gallup Police Department called Lieutenant Troy Velasquez, Sergeant Martin's supervisor, and

---

[4] Defendant argues that there were 41 officers on the scene. But Defendant has not substantiated this claim. By Defendant's own count, there were 21 New Mexico State Police officers, one OMI agent, two Navajo Nation representatives, three U.S. Fish and Wildlife agents, one FBI agent, three animal control agents, three Gallup Police Department Officials, three McKinley County Sheriff's deputies, and three unidentified officers for a total of 40 officers on the scene. The crime scene log, however, does not indicate that New Mexico State Police Officer Arthur Cruz or the McKinley County Sheriff's deputies named by Defendant were present during the search of the property. By the Court's count there were 33 officers on the scene, plus three potentially unidentified officers.

"advised . . . that they were also investigating a couple of burglaries" with Defendant as a suspect. *Id.* at 91:25-92:2. Based on this information, Sergeant Martin allowed three Gallup Police officers into Defendant's home. *Id.* at 92:3-5.

11. Finally, Sergeant Martin indicated that he contacted (or had another New Mexico State Police officer contact) the FBI and McKinley County animal control because (1) he believed there was a potential federal angle to the case and (2) there was an animal involved so he was required to notify animal control. *Id.* at 81:4-8; 93:11-14.

12. Sergeant Martin directed the New Mexico State Police officers to photograph the entre scene as is common practice. *Id.* at 14-16. He encouraged them to take as many photographs as possible from the front to the back of the residence because "there never can be too many photographs." *Id.* at 7-12.

13. In accordance with this directive, officers took more than 1,000 photographs of Defendant's home, belongings, and property.[5]

14. The photographs taken by officers included pictures of the inside of the refrigerator, the interior of an underwear drawer, the walls of the shower, family pictures on the hallway walls, the food in a microwave, a partially loaded dishwasher, clothes sitting in a washing machine, jewelry on the bathroom counter, and money in a wallet.[6]

15. All of these items were exposed during the course of the search. Officers did not move things around in order to take photographs. *Id.* at 82:17-19.

---

[5] At the suppression hearing, Defendant provided the court with copies of the photographs marked Joint Exhibit 6. The photographs are not numbered and Defendant did not elicit any testimony as to the number of pictures. As a result, the Court had to manually count the photographs to confirm that there were more than 1,000 as Defendant claims.

[6] Because Defendant did not number the photographs provided to the Court, the Court is unable to provide citations to specific photographs. Instead, the Court has attached the photographs referenced above to this MEMORANDUM OPINION AND ORDER.

16. On February 5, 2016, New Mexico States Police officers Steven King and Devin Largo were assigned to investigate allegations that Defendant was involved in several burglaries. (Doc. No. 35-1 at 4). Officers King and Largo met with Ernest Bulow, one of the alleged victims, on February 8, 2016. *Id.* at 4-5. Officers King and Largo showed Mr. Bulow all of the photos taken of Defendant's main residence during the January 22, 2016 search. *Id.* at 5. Mr. Bulow identified several items in the photographs that he claims were stolen from his home in 2005. *Id.* at 4-7.

17. Following a similar procedure, New Mexico State Police showed pictures of Defendant's residence to Elvina Emerson, another Gallup resident who contacted the police claiming to have been robbed by Defendant in 2006. *Id.* at 8-9. She also identified alleged stolen property in the photographs of Defendant's home. *Id.*

18. Based on the statements of Mr. Bulow and Ms. Emerson, on February 26, 2016, Officer King obtained a warrant to search Defendant's home for the allegedly stolen property. *Id.* at 3-10.

19. Gallup police officers subsequently showed the January 22, 2016 photographs of Defendant's residence to other Gallup residents, Jeff and Vickie Shaffer, Martin Link, and Steve Westergom, who suspected Defendant of stealing from them in 1996, 2015, and 2000 respectively. (Doc. No. 35-2 at 6-8). After these individuals identified stolen property in the photographs, police obtained a second warrant, dated April 26, 2016, to search Defendant's home for stolen goods. *Id.* at 10.

20. During the two corresponding searches of Defendant's residence, police seized 27 items of personal property. (Doc. No. 35-1 at 12; Doc. No. 35-3 at 3).

21. Defendant was charged with receiving stolen property. (Doc. No. 36-1 at 3).

22. On April 29, 2016, *The Independent*, a Gallup newspaper, published a story about Defendant with 39 color photographs that the paper identified as "police evidence photos taken at the home of Steve Coleman in January." S*ee* Defendant's Exhibit 32.

### Discussion

In his Motion, Defendant initially argued that officers' manner of executing the warrant violated his constitutional rights "as demonstrated by the photographs, the large number of law enforcement personnel, and the time frame of the search." Motion at 19. Defendant did not, however, explain why complete suppression, including suppression of the firearms otherwise lawfully seized under the warrant, was the appropriate remedy for the allegedly unreasonable length of the search, number of officers involved, and documentation of Defendant's residence. This was a serious and potentially fatal oversight.

While a search must be reasonable in its execution in order to pass constitutional muster, *United States v. Pulliam*, 748 F.3d 967, 974 (10th Cir. 2014), suppression of evidence is not an automatic remedy for all Fourth Amendment violations that occur during an otherwise lawful search, *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence, however, has always been our last resort, not our first impulse."). Normally, when law enforcement officers violate a defendant's Fourth Amendment rights during a lawful search, for example by seizing evidence outside the scope of a valid warrant or by unnecessarily destroying property, the appropriate remedy, in a criminal case, is the suppression of those items or pieces of evidence acquired as a result of the illegal conduct, not invalidation of the entire search. *United States v. Allen*, 416 F. App'x 754, 759 (10th Cir. 2011); *see also United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary destruction of property in the course of a search may

violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search not subject to suppression.").

The reason for this rule is twofold. First and foremost, for evidence to be suppressed, a defendant must show a "factual nexus between the illegality and the challenged evidence." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006); *see also United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006) ("[A]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."). In other words, "but-for causality is . . . a necessary . . . condition for suppression." *Hudson*, 547 U.S. at 592 (reasoning that a violation of the Fourth Amendment requirement that police knock and announce their presence before entering a residence does not necessitate suppression of evidence seized upon entry because "[w]hether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house."). Second, even in cases where an officer's unreasonable conduct during the execution of a valid warrant can be characterized as causally related to the seizure of certain evidence, the exclusionary rule is inapplicable if the interests violated by the unreasonable conduct "have nothing to do with the seizure of the evidence." *Id.* at 594.

In accordance with these dictates, courts have consistently rejected requests to suppress evidence based on incidental "manner of execution" violations occurring in otherwise lawful searches. *See Hudson*, 547 U.S. at 592 (failure to knock and announce does not require suppression); *United States v. Adams*, 740 F.3d 40, 43 (1st Cir. 2014) (suppression not appropriate where alleged constitutional violation – carrying firearms during an IRS search – had "no impact either on the scope of the search or on the extent of the evidence collected."); *United*

*States v. Ankeny*, 502 F.3d 829, 837-838 (9th Cir. 2007) (declining to suppress evidence because discovery of guns was not causally related to the allegedly unconstitutional use of rubber bullets, flash-bang devices, and breaking of windows and doors); *United States v. Garcia-Hernandez*, 659 F.3d 108, 114 (1st Cir. 2011) (even if police infringe on a defendant's Fourth Amendment rights by executing a warrant in an overly aggressive manner, the fruits of the search are not subject to suppression); *United States v. Jones*, 214 F.3d 836, 838 (7th Cir. 2000) (damages, not the exclusion of evidence, is the appropriate remedy for the use of unreasonable force in execution of warrant, when the application of reasonable force would have produced the same evidence); *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000) (unconstitutional media presence during search did not necessitate suppression of evidence because media personnel did not expand scope of search); *United States v. Gregoire*, 638 F.3d 962, 967 n.1 (8th Cir. 2011) (same).

As these cases illustrate, in general, a court need not suppress the evidence seized during a search unless the Fourth Amendment violation in the search's manner of execution led to the discovery of evidence that would not otherwise have been collected if the search had been conducted in a lawful manner.

In his first swing of the bat, however, Defendant failed to present any argument that the alleged defects in the execution of the warrant enlarged the search or were in any way causally connected to the seizure of the firearms Defendant seeks to suppress. As a result, in its Response, the United States appropriately urged the Court to find that suppression was not the correct remedy for any alleged violations in the overall manner of execution of the January 22, 2016 search of Defendant's property. Although Defendant failed to directly counter this argument, Defendant's Reply and Defense Counsel's oral arguments at the June 14, 2016 suppression

9

hearing clarified that Defendant was not concerned simply with the length of the search, the method of documentation, and the number of officers involved. Rather, Defendant was making the argument that the officers' conduct during the search transformed the originally lawful search of Defendant's property into an unconstitutional "fishing expedition for the discovery of incriminating evidence" that was not identified in the warrant, such as evidence that Defendant possessed stolen goods or prohibited Indian artifacts. Reply at 12; Transcript at 107:17-22, 109:10-15. In other words, as is necessary for the Court to consider suppressing evidence, Defendant contends that the alleged misconduct during the execution of the warrant resulted in the expansion of the search and the unauthorized collection of evidence. Even more importantly, Defendant produced evidence to support this claim. Specifically, Defendant elicited testimony that the challenged conduct resulted in the expansion of the search to include (1) visual searches for evidence of burglary and possession of patrimony and (2) the collection of incriminating photographs that ultimately led to Defendant being charged with several burglaries.

In order to allow the parties the opportunity to formulate arguments regarding the constitutional implications of this conduct, on July 19, 2016, the Court issued an ORDER FOR SUPPLEMENTAL BRIEFING (Doc. No. 33) regarding Defendant's updated argument that the fruits of the January 22, 2016 search should be suppressed because officers grossly exceeded the scope of the warrant by searching for and collecting evidence of crimes for which the warrant did not provide probable cause. The parties' rejoinders confirm that the key remaining issue in this case is whether the officers showed such flagrant disregard for the terms of the warrant, which limited officers to searching for evidence of firearms and dog shooting, that the resulting search became a general search the fruits of which the Court must suppress under *United States v.*

*Medlin*, 842 F.2d 1194 (10th Cir. 1988) and progeny.[7] Answering this question is factually and legally complicated.

### A.  Blanket Suppression Doctrine

The Tenth Circuit Court of Appeals has created an exception to the general rule that a court should suppress only the improperly acquired evidence, not all of the evidence, when a search has both constitutional and unconstitutional aspects. "Under the law of this circuit, even evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit flagrant disregard for its terms." *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996) (internal citations omitted). The Tenth Circuit Court of Appeals refers to this doctrine as "blanket suppression." *Id.* (agreeing that blanket suppression was warranted "because the state officers had exhibited flagrant disregard for the terms of the warrant by conducting a wholesale seizure of [the defendant's] property amounting to a fishing expedition for the discovery of incriminating evidence.").

The Tenth Circuit Court of Appeals first recognized what has taken root as the blanket suppression doctrine in *United States v. Medlin*, 798 F.2d 407, 411 (10th Cir. 1986) (*Medlin I*). There, in addition to seizing numerous firearms, law enforcement officers executing a valid warrant for firearms also seized more than 500 items of personal property, including jewelry, furs, cameras, tools, sporting goods, and electronics, which the officers believed to be stolen. *Id.* at 408. The defendant argued that the unauthorized seizure of the allegedly stolen items invalidated the entire search because officers substantially exceeded the scope of the warrant. *Id.* at 410. The United States, on the other hand, contended that the potentially unlawful seizure of

---

[7] Despite multiple opportunities to do so, Defendant has never argued that the Court should suppress the firearms that form the basis of this federal criminal prosecution because the seizure of these firearms was directly related to some illegality in the manner in which the search was executed. As a result, the Court will treat this issue as abandoned and will focus its attention on the propriety of blanket suppression.

personal items was "completely irrelevant to the admissibility of the weapons" lawfully seized under the warrant. *Id.* at 411. The Tenth Circuit Court of Appeals disagreed with the United States' hardline position. It opined that "flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search and thus require suppression or return of all evidence seized during the search." *Id.* Because the facts, however, were underdeveloped, the Tenth Circuit Court of Appeals remanded the case for the district court to consider whether officers used the warrant "as a pretext for a general search, which would taint the whole search." *Id.*

On remand, the district court entered an order completely suppressing the evidence acquired during the search, including the firearms that the warrant permitted officers to seize. The United States appealed, but the Tenth Circuit Court of Appeals affirmed the blanket exclusion of evidence. *United States v. Medlin*, 842 F.2d 1194, 1195, 1200 (10th Cir. 1988) (*Medlin II*). The Tenth Circuit explained that the basis for blanket suppression "is found in our traditional repugnance to 'general searches' which were conducted in the colonies pursuant to writs of assistance." *Id.* at 1199. Given this traditional repugnance, the Tenth Circuit held that blanket suppression of evidence is required when a search warrant is executed with such flagrant disregard for its terms that the particularity requirement is contravened and a valid warrant transformed into a general warrant. *Id.*

This remains the controlling law of the Tenth Circuit. *See United States v. Webster*, 809 F.3d 1158, 1165 (10th Cir. 2016) ("[W]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant."). Nonetheless, while Tenth Circuit has never retreated from the

holdings in *Medlin I* and *Medlin II*, it has emphasized that blanket suppression is an "extreme" remedy that should only be imposed in extraordinary cases. *Id.* at 1163; *see also Foster*, 100 F.3d at 852; *Allen*, 416 F. App'x at 759. A defendant seeking complete suppression has the heavy burden of showing (1) that law enforcement officers exceeded the scope of the warrant in violation of the defendant's constitutional rights and (2) that the officers' unlawful behavior was so egregious that it transformed the search into a general search in violation of deeply held Fourth Amendment protections against unconstrained, exploratory rummaging and fishing expeditions. *See generally Webster*, 809 F.3d 1158. Only in such cases – where illegal police conduct taints the entire search – do the deterrence benefits of suppression outweigh the societal costs of suppressing evidence the defendant had no right to prevent law enforcement officials from seeing or taking. *See id.* at 1167. Here, although the Court agrees with Defendant that the officers unconstitutionally expanded the scope of the search to include third party inspections for traditional artifacts and stolen property, Defendant has failed to show that suppression is an appropriate remedy for this and the other alleged misconduct.

**B.  Did officers violate Defendant's Fourth Amendment rights?**

In his Motion, Defendant identifies three ways in which the officers allegedly exceeded the bounds of the warrant: (1) the search lasted over ten hours, (2) more than forty people participated in the search, including law enforcement personnel without jurisdiction over his property, and (3) officers took more than 1,000 photographs of Defendant's home and property.[8] The Court will first address whether Defendant has cleared the preliminary hurdle of showing that this conduct was constitutionally unreasonable.

---

[8] In his Motion, Defendant also complains that officers seized his home security camera. Motion at 20. The warrant, however, authorized the seizure of electronic devices and Defendant has not challenged the validity of this provision. In the absence of such a challenge, the Court will not treat the seizure of the camera as a potential ground for suppressing the firearms lawfully seized under the warrant.

i.    *Length of the Search*

As the United States acknowledges, *see* Response at 11, "[a] search must be reasonable not only in its inception, but also in its execution." *Pulliam*, 748 F.3d at 974. Theoretically, if officers were unreasonably and inexcusably sluggish while executing a warrant, this might violate a defendant's Fourth Amendment rights. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (a car stop may "become unlawful if it is prolonged beyond the time reasonably required to complete that mission"); *Perez v. Borough of Berwick*, 507 F. App'x 186, 192 (3d Cir. 2012) (finding a genuine issue of material fact regarding the reasonableness of the length of a warrant search). But Defendant has not produced any evidence, identified any case law, or made any argument demonstrating that 13.5 hours was an unreasonable length of time for officers to spend searching his 423.5 acre property for the evidence listed in the search warrant. Hence, the "timeframe" of the search does not provide grounds for suppressing any evidence seized during the search.

ii.    *The Large Number and Responsibilities of People Participating in the Search*

Defendant also insists that the large number of law enforcement personnel present during the search "went well beyond what was legal." Motion at 19. As before, however, Defendant has not produced any evidence or legal support for a determination that the mere number of officers involved in the search of his home was unreasonable. To the extent Defendant is asserting such a claim, the Court rejects it. *See Medlin II*, 842 F.2d at 1196 ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant."). This leaves Defendant's more limited claim that the presence of certain attorneys and officers was unlawful.

Defendant stresses that numerous people were present during the search who worked for law enforcement agencies that did not have jurisdiction over Defendant's property. To support his claim that this was unconstitutional, Defendant directs the Court's attention to *Wilson v. Layne*, 526 U.S. 603 (1999). In *Wilson*, the Supreme Court unanimously held that "it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id.* at 614. Defendant is correct that *Wilson* clearly prohibits officers from inviting extraneous third parties onto the scene of a search in order to accomplish goals that are unrelated to the lawful purpose of the search. *Id.* at 611 (reasoning that "the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion").

Defendant, however, has not shown that the individuals from other law enforcement agencies who were present at the search lacked a lawful reason under *Wilson* for their involvement in the search. Without any factual support, Defendant asserts that officers who had no jurisdiction over his property must have been unlawfully present because they could "add nothing to a search for firearms." Motion at 21. This is a non sequitur. Sergeant Martin testified that "it is not uncommon . . . for different law enforcement officers of different organizations to work together in response to a case." Transcript at 81:8-11. Moreover, the Tenth Circuit has made clear that it is permissible for state, local, and federal law enforcement agencies to cooperate and assist each other when executing warrants. *Medlin II*, 842 F.2d at 1196. Here, Defendant did not elicit any evidence about why the majority of the various officers and

attorneys were present on the scene or what they were doing during the search.[9] As a result, the Court is not in a position to make a finding in Defendant's favor that these individuals' involvement in the search violated Defendant's constitutional rights.

Nevertheless, the actual evidence submitted by Defendant does support a finding of illegality, albeit one much more limited than Defendant suggests. Putting aside Defendant's generalized arguments about the number or jurisdiction of the officers involved in the search, Defendant has provided the Court with evidence that eight or nine people lacked a legitimate reason for their activities on the scene. Sergeant Martin testified that he invited two or three representatives from the Navajo Nation to the scene to verify that certain objects in the house were traditional artifacts – an objective wholly unrelated to the lawful execution of the search warrant. These representatives from the Navajo Nation brought with them into the home three United States Fish and Wildlife agents. The United States has not articulated any lawful justification for this intrusion and the Court cannot think of one. It is clear from Sergeant Martin's testimony that these individuals "were not present for any reason related to the justification for police entry into the home" – the execution of the warrant for firearms and dog shooting evidence. *See Wilson,* 526 U.S. at 611. To the contrary, Sergeant Martin explained that he invited members of the Navajo Nation to Defendant's home in order conduct their own, separate visual search of the property, which he described as taking place "after [the New Mexico State Police] search." Transcript at 84:23-25. In fact, Sergeant Martin specifically directed the Navajo Nation officers that they were not allowed "to help us get anything." *Id.* at

---

[9] For example, five people from the District Attorney's office were present during the search. Defendant elicited testimony that this was atypical. But, he did not ask any questions about why these people were present or what they were doing, so the Court remains completely in the dark about whether the members of the District Attorney's office had valid reasons to aid in the execution of the warrant.

97:14-15. From this testimony it is clear that the Navajo Nation and the United States Fish and Wildlife agents were not on the scene to lawfully assist in the execution of the warrant.

Sergeant Martin's testimony supports a similar conclusion with regard to the presence of the three Gallup Police Department officers. When asked about whether he invited them to the scene, Sergeant Martin responded that the Gallup Police officers reached out to his supervisor and advised that they were investigating "a couple of burglaries" in which Defendant was a suspect. *Id.* at 91:21-:92:2. Based on this information, Sergeant Martin invited the Gallup Police Department to send people to the scene. *Id.* at 92:5. The Court cannot condone this blatant disregard of the Supreme Court's directive that "police actions in execution of a warrant [must] be related to the objectives of the authorized intrusion." *Wilson,* 526 U.S. at 611. Under *Wilson*, the Court concludes that Sergeant Martin, the search supervisor for the New Mexico State Police, unlawfully permitted Navajo Nation, United States Fish and Wildlife, and Gallup Police Department representatives onto the scene in contravention of the terms of the search warrant, which limited officers to searching for firearms and evidence of the dog shooting.

iii.    *Excessive Photographing*

In his best articulated challenge to the manner of execution, Defendant contends that the extensive photographing of his residence was unlawful. At first glance, Defendant's arguments are compelling. Officers took hundreds of photographs memorializing the personal contents of Defendant's home, including personal property that was not the subject of the search warrant, such as the inside of the refrigerator, the interior of an underwear drawer, the walls of the shower, family pictures on the walls, the food in a microwave, and the money in a wallet. As a practical matter, the Court agrees with Defendant that "[i]t is one thing to be present in a home carrying out the directives of a warrant, and of necessity being in a position to cursorily notice

17

many of its contents. It is quite another to inspect the contents of a home and to create a permanent record of it." *Commonwealth v. Balicki*, 762 N.E.2d 290, 299-300 (Mass. 2002). The exhaustive documentation of Defendant's home and belongings certainly strikes the Court as gratuitously intrusive.

Defendant, however, has not cited any case law placing a Fourth Amendment limitation on police photographing or video-recording items observed in plain view during a lawful search.[10] This is likely because current Fourth Amendment jurisprudence does not support the conclusion that photographing a search, even in great detail, is constitutionally problematic. According to this Court's research, every federal court to consider the question has held that officers do not infringe on a defendant's Fourth Amendment privacy or property interests by photographing or otherwise documenting items that are in plain view during an otherwise lawful search. *See United States v. Danhach*, 815 F.3d 228, 234 (5th Cir. 2016) (noting, without deciding, that "[s]everal circuits have held that law-enforcement agents may photograph incriminating items in plain view"); *United States v. Mancari*, 463 F.3d 590, 596 (7th Cir. 2006) ("[W]hen officers who are lawfully on the premises pursuant to a valid search warrant merely record what they observe there that is in plain view, they do not invade legally protected privacy or any other legal interest."); *Bills v. Aseltine*, 958 F.2d 697, 707 (6th Cir. 1992) (reasoning that officer lawfully present within a home could photographs items in plain view because "the recording of visual images of a scene by means of photography does not amount to a seizure because it does not 'meaningfully interfere' with any possessory interest."); *United States v. Speece*, Nos. 92-3077, 92-3078, 1993 U.S. App. LEXIS 1310, at *6 (10th Cir. Jan. 26, 1993) ("Since the officers were lawfully on the premises, their use of photographs of items in plain

---

[10] In *Balicki*, Defendant's primary authority, the Supreme Judicial Court of Massachusetts specifically reserved ruling on "whether the videotaping and photographing of a proper search would be unconstitutional." *Balicki*, 762 N.E.2d at 300 n. 13.

view was also lawful.") (unpublished); *United States v. Harb*, Case No. 2:07-CR-426, 2009 U.S. Dist. LEXIS 26745, at *7, 21-22 (D. Utah Mar. 30, 2009) (holding that agents could lawfully photograph every room during the execution of a search warrant because photographing was not a Fourth Amendment seizure).

This consensus is grounded on the Supreme Court's admonition in *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) that the visual inspection of something lawfully exposed to the view of the police is not a search for Fourth Amendment purposes. *Id.* at 328. In *Hicks*, the defendant argued that a police officer conducted an unlawful search, during an emergency shooting investigation, when the officer moved a piece of stereo equipment in defendant's apartment in order to record the serial number and check if the equipment was stolen. *Id.* at 323-324. The Supreme Court held that the movement of the equipment constituted an unlawful search unrelated to the exigency that justified entry into the defendant's apartment. *Id.* at 324-325. The Supreme Court opined, however, that "merely inspecting those parts" of the equipment that were visible "would not have constituted an independent search, because it would have produce[d] no additional invasion of [defendant's] privacy interest." *Id.* at 325. To bolster its reasoning, the Supreme Court cited *Ill. v. Andreas*, 463 U.S. 765 (1983), *id*. at 325, a previous Supreme Court case pronouncing that "once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost." *Andreas*, 463 U.S. at 771. Courts have relied on the reasoning in *Hicks* to conclude that a defendant does not possess a privacy interest that would prevent the close observation or photographing of items in plain view. *See supra* cases cited in the previous paragraph; *see also Horton v. California*, 496 U.S. 128, 133-134 (1990) ("If an article is already in plain view, . . . its observation . . . [does not] involve any invasion of privacy.").

In accordance with this authority, the Court determines that the act of photographing Defendant's residence did not constitute an unlawful search or seizure in violation of Defendant's Fourth Amendment rights. *See Wilson*, 526 U.S. at 613 ("[I]it might be reasonable for police officers to themselves videotape home entries as part of a 'quality control' effort to ensure that the rights of homeowners are being respected, or even to preserve evidence.").

This does not mean that the Court is insensitive to Defendant's concerns about the alleged publication of the photographs[11] and use of the photographs to investigate Defendant's supposed involvement in local burglaries. Just because the act of photographing items in plain view is not a Fourth Amendment search or seizure, the Court is not necessarily convinced that the Fourth Amendment imposes no limitation on officers' ability to crop, magnify, share, sell, or otherwise use such photographs. Sharing personal photographs of a defendant's home with the public or other law enforcement agencies undoubtedly comprises an additional intrusion on the interests that lie "at the very core of the Fourth Amendment," namely preserving the privacy and the sanctity of the home. *Storey v. Taylor*, 696 F.3d 987, 994 (10th Cir. 2012); *see Ayeni v. Mottola*, 35 F.3d 680, 688 (2d Cir. 1994) (agreeing that police-approved media recording of a search constituted a Fourth Amendment seizure of images that "rendered the search far more intrusive than it needed to be").

The Supreme Court's decision in *Wilson* bolsters this conclusion. There, the Supreme Court recognized that a warrant allowing officers to search a home does not permit officers to bring media representatives to record the search. *Wilson*, 526 U.S. at 612. This decision indicates that a warrant does not strip the residents of all Fourth Amendment privacy interests in the areas

---

[11] The Court notes that Defendant has not produced ironclad proof that pictures from the January 22, 2016 search were published in the paper. The newspaper provided to the Court identified the published photographs as having been taken during the January 2016 search. But, the Court was unable to match several of the photographs in the paper with the set of photographs provided to the Court.

of the home exposed to view during the search. *See id.* (rejecting claim that "officers should be able to exercise reasonable discretion about when it would further their law enforcement mission to permit members of the news media to accompany them in executing a warrant" because "this claim ignores the importance of the right of residential privacy"); *see also Bray v. Planned Parenthood Columbia-Willamette, Inc.*, 746 F.3d 229, 237 (6th Cir. 2014) ("The Supreme Court made clear in *Wilson* that the right to be present in a home does not necessarily entitle police to bring photographers with them."). The reasoning in *Wilson* would unquestionably bar a police department from adopting a policy of live streaming all searches or selling videos of their searches to media outlets for public consumption.

Similarly, given the myriad cases decrying "general searches," the Court would have no trouble concluding that the Fourth Amendment prevents a police department from implementing a dragnet operation documenting all valuable items observed while executing local search warrants and then publishing these photographs in an on-line database for victims and members of other law enforcement agencies to inspect for evidence of stolen goods or other crimes. Such conduct would unquestionably run afoul of the Fourth Amendment particularity requirement, which guards against general searches in whatever form they take. *Foster*, 100 F.3d at 852 (the Fourth Amendment prohibits law enforcement from conducting a fishing expedition for evidence of additional crimes every time a search warrant is executed); *see also United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994) ("[T]he plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.") (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971) (plurality opinion)).

For both of these reasons, the Court remains unconvinced by the United States' argument that Defendant has absolutely no Fourth Amendment rights in relation to the dissemination of the

photographs of his home because the photographed property was in plain view during the search and the photographing did not affect Defendant's possessory interest in the property. While a defendant certainly lacks a privacy interest in the observation of an item in plain view, this principle has limits. Relevant to this case, courts have been chary of extending the plain view doctrine where law enforcement officials seek to justify massive, wide-ranging, detailed, and unlimited "plain view" inspections of documents exposed to view during otherwise lawful searches. *See United States v. Garcia,* 496 F.3d 495, 510 (6th Cir. 2007) (holding that a "document, even though in plain view, is [not] within the plain view exception if it must be read in order for its incriminating nature to be determined"); *United States v. Wright*, 667 F.2d 793, 798 (9th Cir. 1982) (reasoning that the plain view doctrine does not empower officers to minutely inspect "diaries, letters, films and all matter of private materials unrelated to the authorized scope of the search" even when these documents are exposed to view while searching for other small items). These cases suggest that officers may not transform a valid search into a general search by reading, inspecting, documenting, scrutinizing, and sharing information about every item in plain view, without regard to the purpose of the underlying search. But, the law in this area is underdeveloped. Neither side has provided the Court with citations that would directly assist the Court in determining when the use of photographs taken during a lawful search becomes unconstitutional. Moreover, the Court lacks sufficiently detailed information about the photograph sharing to form a clear opinion about whether it was reasonable.[12] For instance, Defendant has not provided the Court with any information about who decided to share the

---

[12] The United States briefly argues that the photographing of artwork and other items not identified in the warrant was acceptable because "officers were lawful in their presence at the Coleman premises and the artwork was suspected contraband in plain view" that officers "had the authority to seize." UNITED STATES' RESPONSE TO ORDER FOR SUPPLEMENTAL BRIEFING (Doc. No. 38 at 3). However, an officer seeking to justify a plain view seizure must show that the "incriminating character of the object [was] 'immediately apparent' to the officer." *United States v. Gordon*, 741 F.3d 64, 71 (10th Cir. 2014). The United States has not produced any evidence that the officers at the scene had probable cause to believe the pictures were stolen goods. The Court, therefore, declines to conclude that officers were entitled to seize the artwork, or photos of the artwork, under the plain view doctrine.

photographs with the newspaper, who approved the decision to show these photographs to potential burglary victims, when these decisions were made, and what justification officers had for these decisions.

Given the gaps in the factual record and the weakness of the briefing, the Court is hesitant to forge ahead with a ruling regarding the legality of the challenged photograph dissemination. Luckily, the Court can resolve this case on other grounds. For the reasons outlined below, the Court concludes that blanket suppression of the firearms whose seizure was authorized by the warrant is not appropriate, even assuming the photograph sharing violated Defendant's constitutional rights.[13]

### C.  Did the alleged misconduct result in a general search requiring the complete suppression of evidence?

In its supplemental brief, the United States maintains that blanket suppression is not an appropriate remedy in this case because the alleged illegality did not involve the physical seizure of Defendant's property. To justify this position, the United States reads *Medlin II* and its progeny as limiting the doctrine of blanket suppression to cases where law enforcement officers grossly exceed the scope of a warrant in the seizure and removal of property. The Court acknowledges that the Tenth Circuit cases approving the blanket suppression of evidence both involve wide-scale seizures of property. However, the Tenth Circuit Court of Appeals has always articulated the blanket suppression doctrine in broader terms. *See, e.g., Webster*, 809 F.3d at 1165 ("The basis for blanket suppression when a search warrant is executed with flagrant disregard of its terms is found in our traditional repugnance to 'general **searches**' . . . ) (emphasis

---

[13] The United States argues that the Court does not need to consider whether blanket suppression is appropriate because the inevitable discovery doctrine applies in this case. This cannot be correct. If the inevitable discovery doctrine could justify setting aside blanket suppression in a case where police use a valid warrant as a pretext to conduct a general search, the blanket suppression doctrine would have no teeth and the Tenth Circuit Court of Appeals would not have excluded the evidence lawfully seized under the warrants in *Medlin II* and *Foster*.

added); *Foster*, 100 F.3d at 849 ("[E]ven evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit flagrant disregard for its terms."). Under the law of this circuit, blanket suppression is required whenever law enforcement officers grossly exceed the scope of a search warrant and, as a result, transform an otherwise valid warrant into a general warrant. This includes situations where officers show flagrant disregard for the warrant by illegally seizing large amounts of personal property exposed during an otherwise lawful search <u>and</u> situations where officers use a valid warrant as a pretext to rummage through an entire house, without limiting their search to areas where the evidence to be seized is likely to be found. The flagrant use of a warrant to conduct a general search triggers the blanket suppression doctrine regardless of whether the general search involves the physical seizure of evidence.[14]

The question in this case is whether the illegality (inviting other law enforcement officials to the scene to conduct their own, independent visual searches for evidence of unrelated crimes) and the alleged illegality (using copies of the pictures of the search to investigate Defendant's involvement in unrelated crimes) transformed the otherwise lawful search of Defendant's residence for firearms and dog shooting evidence into a general search in violation of the Fourth Amendment.

Defendant has made an initial showing that the above behavior expanded the search beyond the bounds contemplated by the warrant. First, the officers executing the search warrant invited third parties to the scene to walk through Defendant's home and look at the exposed

---

[14] For example, if officers obtain a valid warrant to install a camera in a defendant's business to record illegal drug sales, but disregard the terms of the warrant and install cameras both in the business and in defendant's adjoining apartment, officers may thereby transform the installation of the cameras into a general search in violation of the particularity requirement. *See United States v. Juichang Chen*, 979 F.2d 714, 718 (9th Cir. Cal. 1992) (considering whether the unapproved installation of a camera grossly exceeded the scope of warrant allowing officers to install only one camera).

items for evidence of other crimes, namely the possession of traditional artifacts and stolen

property. Second, the officers executing the search warrant took hundreds of pictures of

Defendant's main residence, which were then shown in their entirety to the victims of alleged

burglaries and used to obtain warrants to search Defendant's home for stolen property. The Court

concludes, however, that this conduct was not so extreme that it tainted the entire search,

including the lawful seizure of the firearms recovered on the property.

The officers' most obvious misstep was inviting eight or nine third parties to the scene

for purposes unrelated to the underlying search. But this misconduct only resulted in a small

expansion of the search compared to the lawful seizure of the evidence identified in the January

22, 2016 warrant. By Defendant's own admission, more than 33 individuals participated in the

search, including 20 New Mexico State Police officers who had primary responsibility for

executing the warrant. As this shows, the people lawfully at the scene far outnumbered the eight

or nine law enforcement officials conducting an unauthorized visual search of the property.

Moreover, Sergeant Martin directed the visiting law enforcement officials not to touch anything.

As a result, their incursion on Defendant's Fourth Amendment rights was relatively minimal

when compared with the intrusion into the home authorized by the warrant.

As for the invasive photographing of Defendant's home and belongings, to prevail on his

request for blanket suppression, Defendant must show that the use and sharing of the

photographs lawfully taken during the search retroactively transformed the search into an

unconstitutional general search.[15] In other words, Defendant must show that the allegedly

---

[15] For the reasons discussed above, the mere documentation of the items exposed to plain view does not provide grounds for a viable Fourth Amendment claim. Consequently, Defendant's challenge to the photographing of his residence depends on the legality of officers' use and sharing of the photographs and whether this use and sharing involved such flagrant disregard for the terms of the warrant that blanket suppression is appropriate.

unconstitutional photograph sharing and use was so closely tied to the prior search that it tainted the legality of this search. Defendant has not produced sufficient evidence to make this showing.

While there is some circumstantial evidence that the officers executing the search warrant contemplated using the pictures taken during the search to investigate Defendant's involvement in nearby burglaries, this is not entirely clear. Sergeant Martin testified that he directed the officers to take photographs of the entire facility because this was common practice. He explained that he told the officers taking the pictures that "there never can be too many photographs taken" because they could always delete photographs that were unnecessary. Transcript at 83:7-12. Defendant did not produce any evidence to rebut this testimony or show that specific pictures were taken in order to create evidence for a contemplated burglary prosecution. Nor did Defendant elicit testimony that would allow the Court to infer that this occurred. Defendant did not provide any evidence about who took these pictures, when they were taken (e.g., before or after the arrival of Navajo Nation and Gallup Police representatives), whether the people taking the photographs knew about the burglary investigation, when the decision to show the photographs to burglary victims was made, etc. In short, Defendant has not provided the Court with evidence showing that the decision to use these pictures in an unrelated investigation was so connected to the lawful search of Defendant's property that the Court can conclude that the photograph sharing tainted the earlier seizure of the evidence identified in the warrant.

This is critical because the motive of the officers plays an essential role in showing that the officers flagrantly disregarded the terms of a warrant. In determining whether complete suppression is appropriate, courts not only consider the extent to which officers exceeded the bounds of a warrant, courts also consider the officers' reasons for contravening the limitations

26

contained in the warrant. *See United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) ("Nor is blanket suppression appropriate where the agents exceed the limits of their authority under the warrant based on practicality considerations or mistake."); *Marvin v. United States*, 732 F.2d 669, 674-675 (8th Cir. 1984) (finding that complete suppression was inappropriate because "the agents attempted to stay within the boundaries of the warrant and . . . the extensive seizure of documents was prompted largely by practical considerations and time constraints."); *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997) (seizure of entire file cabinet "did not grossly exceed the warrant" because motivated by practical concerns). Whatever suspicions Defendant may have about the officers' conduct in this case, the Court cannot rule out the possibility that officers took pictures of Defendant's residence in good faith simply to document the premises being searched as was authorized by the warrant, and only later, with some good reason, decided to use these photographs in other investigations. The Court concludes that this is not an extraordinary case where the deterrence value of complete suppression outweighs the interest in admitting the evidence seized under the search warrant.

IT IS THEREFORE ORDERED that Defendant's MOTION TO DISMISS COUNT II AND MOTION TO SUPPRESS ALL FRUITS OF SEARCH, FOR ALL PURPOSES, INCLUDING BUT NOT LIMITED TO TRIAL TESTIMONY, IMPEACHMENT, REBUTTAL, CALCULATION OF SENTENCING GUIDELINES, AND SENTENCING CONSIDERATION (Doc. No. 20) is denied.

_____
SENIOR UNITED STATES DISTRICT JUDGE